# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| **IN RE TRI-STATE WATER RIGHTS LITIGATION** | **CASE NO. 3:07-MD-1-PAM-HTS** |
| | |
| **STATE OF FLORIDA,** | **CASE NO. 3:07-cv-00250-PAM-HTS** |
| **Plaintiff,** | |
| **v.** | |
| **UNITED STATES FISH AND WILLDLIFE SERVICE  et al.** | |
| **Defendants.** | |

## THIRD AMENDED AND SUPPLEMENTED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

The State of Florida ("Florida") states its third amended and supplemented complaint and prays for relief as follows:

### PRELIMINARY STATEMENT

1.     This action seeks review of the following final agency actions and failures to act:

a.     The United States Army Corps of Engineers' (the "Corps") failure to meet its statutory obligation to consult with the United States Fish and Wildlife Service (the "FWS" or the "Service") on *all* of the Corps' dam and reservoir operations in the Apalachicola-Chattahoochee-Flint ("ACF") River Basin that are subject to review under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*   The Corps has unlawfully segmented its operations by consulting only on a limited portion of those operations it calls the Revised Interim Operations Plan ("RIOP") for Jim Woodruff Lock and Dam ("Woodruff Dam").   The RIOP was developed on April 15, 2008.   This set of "interim operations" is the latest in a long line of such "interim" plans, all of which represent a thin veneer concealing a broader set of discretionary

operations throughout the ACF Basin.  By repeatedly consulting only on a series of limited operations, the Corps has insulated from ESA review the fundamental decisions that ultimately dictate flow in the Apalachicola River.

        b.     A Biological Opinion ("BiOp") and Incidental Take Statement ("ITS") contained therein, purportedly authorizing the "taking" (i.e., death and injury) of protected mussel species, issued on June 1, 2008 by the Service.  The BiOp and ITS replaced earlier versions dated September 5, 2006 and November 15, 2007, which Florida challenged in its original and amended Complaints.  The BiOp resulted from consultation by the Corps with the Service pursuant to Section 7 of the ESA, 16 U.S.C. § 1536, concerning the effect of the RIOP on species and habitats in the Apalachicola River that are protected under the ESA.  Among other things, the BiOp fails to analyze properly the aggregate impact of the Corps' RIOP, when added to the environmental baseline and cumulative impacts of non-Federal actions.

### Background on the Corps' "Interim Operations"

    2.     The Corps, on March 7, 2006 ("2006 BiOp"), initiated formal consultation with the Service pursuant to Section 7(a)(2) of the ESA on an earlier set of interim operations ("IOP").  That consultation "[did] not address operational specifics at the four federal reservoirs upstream of Woodruff or all aspects of the operations at Woodruff."  Subsequent amendments to the original plan, known as the modified IOP and the Extraordinary Drought Operation ("EDO") were similarly limited.

    3.     On April 15, 2008, the Corps explained the RIOP: "does not represent a new water control plan for Jim Woodruff Dam. The [RIOP] is a modification of the [earlier] Interim Operations Plan (IOP), which is a definition of temporary discretionary operations within the limits and rule curves established by the existing water control plan (1989)."  The RIOP looks only at limited operational parameters and: "[d]uring normal operations, the [RIOP] does not

include specific operational requirements at the upstream reservoirs other than the use of the composite reservoir storage of the system and releases from the upstream reservoirs as necessary to assure releases from Jim Woodruff Dam ... ."

4.      Florida seeks a declaration that the Corps improperly consulted with the FWS under ESA Section 7(a)(2) on the RIOP and its predecessors, which represent only a limited portion of the Corps' ongoing, discretionary dam and reservoir operations in the ACF Basin. The broader array of Corps operations not yet subjected to ESA consultation are generally set forth in a 1989 Draft Water Control Plan, which the Corps has been implementing for nearly twenty years, thus making it the "De Facto Plan."  The De Facto Plan was not officially adopted in accordance with the Flood Control Act, and has never been subjected to review under the Nation's environmental laws.

5.      The De Facto Plan erroneously assumes that water supply is an authorized purpose of Lake Lanier.  The RIOP, accordingly, assumes the same, and operations conducted under the RIOP are constrained by this assumption.  Specifically, the RIOP is designed, in part, to retain water in Lake Lanier for water supply purposes, and the retention of this water comes at the expense of releases downstream.  The Court of Appeals for the District of Columbia held on February 5, 2008 that the Corps improperly reallocated water in Lake Lanier to local consumptive uses around metropolitan Atlanta, resulting in a "major operational change" without congressional approval and in violation of the Water Supply Act, 43 U.S.C. § 390b(d). *Southeastern Federal Power Customers, Inc. v. Geren*, 514 F.3d 1316 (D.C. Cir. 2008).

6.      Florida prays for an injunction directing the Corps to initiate formal ESA Section 7 consultation on all of its discretionary dam and reservoir operations in the ACF Basin, including those discretionary operating choices made in the De Facto Plan, and, until such

consultation is completed, to provide flow support (including from reservoir storage when necessary) to ensure that protected species in the Apalachicola River are not harmed.

7.     Florida seeks a declaration that in light of the holding in *Southeastern Federal Power Customers,* the Corps' RIOP is unlawful to the extent it attempts to serve water supply demands at the expense of threatened and endangered species and their critical habitats in the Apalachicola River.  Florida also seeks an injunction precluding the Corps from including water supply operations at Lake Lanier in the RIOP to the extent those operations are inconsistent with the holding in *Southeastern Federal Power Customers* or the findings of this Court.

### The Service's Biological Opinion

8.     The BiOp addresses the impact of the RIOP on the threatened Gulf sturgeon, an anadromous fish species, and two species of freshwater mussel, the endangered fat threeridge and the threatened purple bankclimber (collectively the "Apalachicola Species"), all of which inhabit the Apalachicola River in Florida and are protected, along with certain habitats, under the ESA.  The BiOp concludes that the RIOP is not likely to "jeopardize" the continued existence of these species or "adversely modify" their critical habitats, despite acknowledging that the RIOP causes significant adverse effects to an already highly-degraded environmental baseline.  The BiOp accomplishes this largely by employing a "comparative" analytical approach that has been held unlawful by various courts.  *See*, *e.g., Nat'l Wildlife Fed'n v. NMFS*, 481 F.3d 1224 (9th Cir. 2007).  The Service's comparative analysis evaluates the impact of the RIOP relative to an arbitrary baseline, rather than evaluating the aggregate impact of the RIOP in the context of the Corps' prior and ongoing operations under the De Facto Plan as a whole.

9.     This action challenges the BiOp because, based on the comparative analytical approach, it, *inter alia*, (a) arbitrarily and capriciously concludes that listed species will not be jeopardized and that critical habitat will not be adversely modified by the RIOP; (b) fails to

4

impose reasonable and prudent alternatives ("RPA") that are adequate in substance and timing to avoid jeopardizing the Apalachicola River Species and adversely modifying their critical habitat; (c) fails to impose reasonable and prudent measures ("RPM") or terms and conditions ("T&C") that are adequate in substance and timing to minimize the impact (*i.e.*, amount or extent) of the taking of individual members of the species and to avoid jeopardizing those species; (d) ignores the best scientific and commercial data available; and (e) does not accord the benefit of scientific doubt to the species.

10. Florida seeks a declaration that the Service's comparative analytical approach is unlawful. Florida also seeks a declaration that the BiOp's "no-jeopardy" and "no-adverse modification" findings and the ITS all violate ESA Section 7, 16 U.S.C. § 1536, and the FWS' consultation regulations at 50 C.F.R. Part 402, and are arbitrary, capricious, an abuse of discretion and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). This action also requests an injunction directing the FWS to withdraw the BiOp and rescind the ITS, and prepare a new BiOp that complies fully with the requirements of the ESA.

## PARTIES

11. Plaintiff Florida brings this action in its sovereign capacity as a State, with rights to the waters of the ACF Basin, and sovereign and proprietary interests in the fish and wildlife within its borders. Florida has a fiduciary duty, as trustee of the State's waters and natural resources, to conserve and protect the waters and natural resources in the State including her threatened and endangered species and their associated habitats. Florida has expended substantial sums to protect and improve the ecology of the Apalachicola River Basin.

12.     Defendant FWS is an agency of the United States Department of the Interior and is responsible for administering the provisions of the ESA with regard to the threatened and endangered species and critical habitats that are the subject of this action.

13.     Defendant Gail Carmody is sued in her official capacity as the Field Supervisor of the FWS' Field Office, which issued the BiOp.   On information and belief, Ms. Carmody oversaw production of the BiOp and is directly responsible for its contents and conclusions.

14.     Defendant Corps is a division of the United States Army that owns and is responsible for managing the five dams on the Chattahoochee River upstream of the Apalachicola River in Florida.  The Corps' dam and reservoir operations generally, and the RIOP in particular, adversely affect the Apalachicola River Species and their habitats.

15.     Intervenor-Defendant State of Georgia voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived its sovereign immunity rights and any objection it might otherwise have had with regard to venue or personal jurisdiction.

16.     Intervenor-Defendant Atlanta Regional Commission ("ARC") is a public, non-profit organization representing various municipal and governmental bodies in the metropolitan Atlanta area in negotiations with the Corps.  ARC voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

17.     Intervenor-Defendant City of Atlanta ("Atlanta") is a governmental subdivision of the State of Georgia. Atlanta voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

18.     Intervenor-Defendant City of Gainesville ("Gainesville") is a governmental subdivision of the State of Georgia.  Gainesville voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

19.     Intervenor-Defendant City of Cobb County-Marietta Water Authority ("Authority") is a regional public utility that provides drinking and fire protection water on a wholesale basis to retail water suppliers.  The Authority voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

20.     Intervenor-Defendant DeKalb County ("DeKalb") is a governmental subdivision of the State of Georgia.  DeKalb voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

21.     Intervenor-Defendant Fulton County ("Fulton") is a governmental subdivision of the State of Georgia.  Fulton voluntarily submitted itself to the jurisdiction of this Court by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

22.     ARC, Atlanta, Gainesville, Authority, DeKalb, and Fulton may be alternatively referred to herein as "Water Suppliers."

23.     Intervenor-Defendant Southeastern Federal Power Customers, Inc. ("Southeastern") is a non-profit association that represents rural electric cooperatives and municipal electric systems utilities that purchase hydropower from federal projects, including those in the ACF Basin.  Southeastern voluntarily submitted itself to the jurisdiction of this Court

by intervening in this action and waived any objection it might otherwise have had with regard to venue or personal jurisdiction.

## JURISDICTION AND VENUE

24.      This Court has jurisdiction under 5 U.S.C. §§ 701-706 (Administrative Procedure Act), 16 U.S.C. § 1540(g) (Endangered Species Act); 28 U.S.C. § 1331 (federal question), § 2201 (declaratory judgment), and § 2202 (injunctive relief).

25.      On June 19, 2008, pursuant to 16 U.S.C. § 1540(g), Florida provided Defendant Corps with notice of its intent to file suit over the violations alleged herein that arise from the RIOP and the Corps' implementation of it.  Florida filed at least three prior notices under 16 U.S.C. § 1540(g), on June 12, 2007, April 19, 2007, and November 5, 2004, which related to various Corps operations leading to the RIOP.

26.      Venue is vested in the Northern District of Florida under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to Florida's claims occurred in the district.  Defendant FWS' Field Office is in the district.  That office, and Defendant Carmody in particular, is responsible for production of the BiOp.  Moreover, the subject matter of the BiOp -- the Apalachicola River Species and their critical habitats -- are located in the district. Woodruff Dam is located partially in Florida and the Corps' Chattahoochee River reservoir operations directly impact the Apalachicola Species.  Venue in this Court is supported by virtue of the Judicial Panel on Multidistrict Litigation's March 21, 2007 Order transferring this (and other) cases to this Court.

## STATUTORY FRAMEWORK

### *Endangered Species Act*

27.      The ESA is intended "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, … ."  16 U.S.C. § 1531(b).

28.     Under ESA Section 7(a)(2), "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." 16 U.S.C. § 1536(a)(2).

29.     An agency action is "likely to jeopardize the continued existence of" a species if the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. This definition was held to be unlawful in *Nat'l Wildlife Fed'n, supra,* because it does not adequately address the impact of an action on the likely recovery of species. The BiOp, which employs the definition in 50 C.F.R. § 402.02, also fails to account for the impact of the RIOP on species recovery.

30.     According to the consultation regulations of the FWS, an agency action destroys or adversely modifies critical habitat if the action "appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." 50 C.F.R. § 402.02. This definition of adverse modification, however, was held to be unlawful for failing to account fully for the important role critical habitat plays in species conservation. *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059 (9th Cir. 2004) and *Sierra Club v. U.S. Fish & Wildlife Service et al.*, 245 F.3d 434 (5th Cir. 2001) (notably, involving the Gulf sturgeon). The Service has since adopted a "national policy" that evaluates whether adverse modification is occurring based, in part, on the ability of critical habitat to remain functional "to serve the intended conservation role for the species." 71 Fed. Reg. 32,745, 32,764 (June 6,

2006).   As explained below, the BiOp fails to account for the impact of the RIOP on species recovery.

31.      Under the ESA, recovery of listed species is crucial.  Thus, the ESA states that "Conservation' mean[s] to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532(3).  This definition is similar to the FWS' definition of recovery, which "means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act."  50 C.F.R. § 402.02.

32.      Section 9 of the ESA prohibits "take" of listed species by anyone, including federal agencies.  16 U.S.C. § 1538.  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  16 U.S.C. § 1532(19).  The Service has defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.

33.      In addition to its substantive mandates, Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to avoid jeopardy to listed species or destruction or adverse modification of critical habitat.  *See* 50 C.F.R. Part 402. The instant case involves both "informal" and "formal" consultation, however, the challenged BiOp is the result of "formal" consultation.  Formal consultation occurs when the action agency or the Service determines that an action is likely to adversely affect a listed species or its critical habitat.   In that case, the FWS is ultimately responsible for determining whether the action agency's proposed action will rise to the level of jeopardy or destruction or adverse modification

of critical habitat.  50 C.F.R. § 402.14(h)(3).  That determination is expressed in the form of a biological opinion like the challenged BiOp.

34.     In formulating its BiOp, the Service was required to evaluate the "effects of the action" together with "cumulative effects" on the listed species.  50 C.F.R. §§ 402.14(g)(3)-(4). This multi-step analysis requires the FWS to consider: a) the direct, indirect, interrelated and interdependent effects of the action; b) the "environmental baseline," to which the action will be added; and c) any cumulative effects – "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation," 50 C.F.R. § 402.02 (definitions).  In the end, a biological opinion must determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(4).

35.     In rendering its biological opinion (and in formulating all elements thereof), the Service must rely solely on the "best scientific and commercial data available."  16 U.S.C. § 402.14(g)(8). If such data are unavailable, then the Service must "develop the biological opinion with the available information giving the benefit of the doubt to the species."  Final Section 7 Consultation Handbook (1998) (the "Handbook") 1-6.  *See also id.*  ("The Services are then expected to provide the benefit of the doubt to the species concerned with respect to such gaps in the information base (H.R. CONF. REP. NO. 697, 96th Cong., 2nd Sess. 12 (1979)).").

36.     If, based upon an analysis of these factors, the FWS concludes that the proposed action is likely to jeopardize a listed species, or to destroy or adversely modify its critical habitat, it must identify and describe any RPA to the proposed action that it believes would avoid jeopardy and adverse modification.  16 U.S.C. §1536(b)(3)(A).  The effects of an RPA must be

analyzed under the same Section 7 framework herein described as an action proposed by an action agency.  Finally, if the Service believes there is no RPA to the proposed action, its biological opinion must so state.  50 C.F.R. § 402.14(h)(3).

37.     Even if the FWS reaches a no-jeopardy/no-adverse modification finding for either a proposed action or a RPA, it must still issue an ITS for any take of a listed species that is likely to occur as a consequence of those actions that minimizes the impact of that take.  50 C.F.R. § 402.14(i).  Take of listed species that is consistent with an ITS is not subject to the prohibition against take in section 9 of the ESA.  However, the ITS must minimize the impact of the take on the species by including RPMs and mandatory T&Cs designed to implement the RPMs.  50 C.F.R. § 402.14(i)(ii) and (iv).

38.     After consultation has concluded, the obligation to remain in ESA compliance endures.  In certain circumstances, including where subsequent events reveal an impact on species not formerly considered, the consulting agency and the wildlife agency must reinitiate consultation.  50 C.F.R. § 402.16.

39.     Under ESA Section 7(a)(1), federal agencies also must use their authorities to further the purposes of the Act by carrying out programs for the conservation of listed species.  15 U.S.C. § 1536(a)(1).  As a part of its responsibility in preparing a biological opinion, the Service may set forth any conservation recommendations it believes will be necessary to comply with Section 7(a)(1).  50 C.F.R. § 402.14(j).

40.     An agency may not rely on a facially invalid biological opinion and "cannot abrogate its responsibility to decide whether it has taken all possible action to insure that [its project] is not likely to jeopardize the continued existence of the [species]."  *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (D. Hawaii 1984); *City of Tacoma, Washington v. F.E.R.C.*, 460 F.3d

53, 75-76 (D.C. Cir. 2006) ("the action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise.").  Ultimately, the duty to comply with the ESA's substantive mandates lies with the action agency – in this case, the Corps.

### *Administrative Procedure Act*

41.    The APA authorizes courts to hold unlawful, and set aside, agency action findings and conclusions that are arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  Biological opinions and amendments thereto issued pursuant to Section 7 of the ESA are final agency actions and are reviewable under the APA. *See*, *e.g., Bennett v. Spear*, 520 U.S. 154, 175 (1997).  The Service's RIOP represents a "final agency action" reviewable under the APA.

## FACTUAL BACKGROUND

42.    The Apalachicola River is formed by the confluence of the Chattahoochee and Flint Rivers near the Georgia/Florida border.  These systems converge at Lake Seminole, created by Woodruff Dam, which is operated by the Corps.  In terms of volume, the Apalachicola River is the largest river in Florida, discharging an average of approximately 26,380 cubic feet per second ("cfs") into the Apalachicola Bay and estuary system.  Until 2007 when the EDO was implemented, flows in the River historically ranged from a minimum of approximately 5,000 to a maximum of 200,000 cfs.  As a result of the EDO, flows were reduced to a new historic low.

### *Florida's Protection of the Apalachicola River Basin*

43.    Florida is doing its part to achieve the ecosystem-based conservation objectives Congress identified in the ESA.  *See* 16 U.S.C. §1531(b).  Florida adopted, for example, a comprehensive plan for coordinated watershed management in the Apalachicola River Basin. Among the plan's major objectives is the preservation of the existing ecosystem through conservation of habitats, especially those unique or critical habitats on which threatened and

endangered species rely.  In addition to enhancing species protection through regulation, Florida purchased over 280,000 acres to preserve and protect key parts of the Apalachicola River and Bay ecosystem, representing the State's largest land acquisition in any Florida river system. Florida also has administratively reserved all remaining water in the Apalachicola River, preventing its further diversion under State law.

44.    Florida sought for many years to bring about an ESA Section 7 consultation between the Corps and the Service.  Florida anticipated that such consultation would consider the impact of all the Corps' ongoing operations in the ACF Basin, in light of the impacts of the five dams constructed by the Corps and the resultant lakes created thereby, when added to the cumulative effect of Georgia' depletive water withdrawals.  That effort finally resulted in the limited consultation which led to issuance of a biological opinion in September 2006 ("2006 BiOp").  The Corps initiated consultation, and the opinion was generated, only in response to a motion for preliminary injunction filed by Florida in January 2006.  *See Alabama v. U.S. Army Corps of Eng'rs*, 2006 WL 2106991 (N.D. Ala. July 25, 2006).

45.    During and since the term of the 2006 consultation, Florida has been extensively involved in the development of biological and hydrologic data concerning the needs of the Apalachicola Species and the impact of the original IOP and subsequent operations, including variations of the IOP and the EDO on those species and their habitats.  Some of those data were developed in coordination with the FWS, while other data were developed independently by Florida and shared with the FWS.  Much of those data are discussed (and some are misapplied or ignored) in the BiOp.  Florida submitted multiple comments, some formal and some informal, to the Service and the Corps concerning the consultation process and the impact of the RIOP and its

predecessors on the Apalachicola Species.  Florida repeatedly provided data and other technical

support during the consultation processes to both agencies, often at the request of the Service.

### Status of the Apalachicola Species

#### The Gulf Sturgeon and Its Designated Critical Habitat

46.    In 1991, the Service listed the Gulf sturgeon as "threatened" under the ESA.  56

Fed. Reg. 49,653 (Sept. 30, 1991).  Dams constructed and operated by the Corps in the ACF

Basin have blocked sturgeon access to migration routes and historic spawning areas.  When

listing the Gulf sturgeon, the Service observed that the "Federal actions most likely to affect the

Gulf sturgeon are the permitting programs and Federal water resource projects of the U.S. Army

Corps of Engineers."  56 Fed. Reg. at 49,656.

47.    In 2003, the Service designated the Apalachicola River as critical habitat for the

Gulf sturgeon. 68 Fed. Reg. 13,370 (March 19, 2003).  Gulf sturgeon critical habitat includes the

Apalachicola River system and its distributaries (*i.e.*, outflowing branches of the River) which,

along with other critical habitat units, "collectively represent habitat necessary to provide for the

conservation of the species." 68 Fed. Reg. at 13,388.  Designated critical habitat also includes

portions of the Apalachicola Bay in the Gulf of Mexico. 68 Fed. Reg. at 13,397.

48.    Critical habitat for listed species is identified by reference to a series of "primary

constituent elements" or "PCE".  The primary constituent elements of Gulf sturgeon critical

habitat include:

> (4) A flow regime (*i.e.*, the magnitude, frequency, duration,
> seasonality, and rate-of-change of fresh water discharge over time)
> necessary for normal behavior, growth, and survival of all life
> stages in the riverine environment, including migration, breeding
> site selection, courtship, egg fertilization, resting, and staging, and
> for maintaining spawning sites in suitable condition for egg
> attachment, egg sheltering, resting, and larval staging;

68 Fed. Reg. at 13,389.

49.     In 1995, the FWS published the Gulf Sturgeon Recovery/Management Plan ("GS Recovery Plan"), which explained that "spawning habitats should receive maximum protection from disturbance."   Specifically, "protection of spawning habitats of the Apalachicola River would include the upper 20 km (12.4 mi) of the river and its surrounding basin components." This area later was designated as part of critical habitat "Unit 6."  68 Fed. Reg. at 13,393.

50.     In designating Gulf sturgeon critical habitat, the Service determined that:  "[T]he value of critical habitat is appreciably diminished when an action considerably reduces the capability of designated or proposed critical habitat to satisfy requirements essential to the conservation of a listed species."  68 Fed. Reg. at 13,380.  Actions that may destroy or adversely modify Gulf sturgeon critical habitat include, but are not limited to, water impoundment, water diversion and dam operations.  68 Fed. Reg. at 13,380.  The FWS previously acknowledged that such activities include: "(4) Actions that would alter the flow regime (the magnitude, frequency, duration, seasonality, and rate-of-change of fresh water discharge over time) of a riverine critical habitat unit such that it is appreciably impaired for the purposes of Gulf sturgeon migration, resting, staging, breeding site selection, courtship, egg fertilization, egg deposition, and egg development, such as impoundment; water diversion; and dam operations."  68 Fed. Reg. at 13,399.

51.     FWS evaluates the current status of the Gulf sturgeon in the BiOp.  Relying on data from 2005, "[t]he Gulf sturgeon population in the Apalachicola River appears to be slowly increasing relative to levels observed in the 1980's and early 1990's (Pine and Allen 2005)." The Service, however, does not evaluate Gulf sturgeon status between 2005 and 2008.  On information and belief, only about 30 female Gulf sturgeon can spawn in the River each year.

52.     Juvenile Gulf sturgeon utilize the mouth of the River and estuary areas.  As FWS explains in the BiOp:  "the lakes and bays at the mouths of the river systems where Gulf sturgeon occur are especially important because they offer the first opportunity for feeding."  Similarly, "Most subadult and adult Gulf sturgeon spend cool months (October or November through March or April) in estuarine areas, bays, or in the Gulf of Mexico ... ."  Finally, "During the fall migration from fresh to saltwater, Gulf sturgeon may require a period of physiological acclimation to changing salinity levels, referred to as osmoregulation or staging ... ."

53.     The BiOp also acknowledges that high Bay salinities harm juvenile Gulf sturgeon, and that salinities in the Bay were elevated under the original IOP and subsequent interim operations.

54.     When the BiOp was issued, FWS had no data regarding whether Gulf sturgeon spawning occurred in 2007 or 2008.  After the BiOp was issued, research demonstrated that Gulf sturgeon spawned in 2008 at three sites in the Apalachicola River, the primary site remaining immediately below Woodruff Dam.  The spawning actively lasted 41 days between April 4 and May 15.  When the depths of eggs collected through 2008 are combined, the majority of collections occur at depths from 7.2 to 17.1 feet.  Under the EDO, river flows during the spawn fluctuated wildly from over 35,000 cfs to under 10,000 cfs.

<u>The Mussel Species and Their Critical Habitat</u>

55.     The Service listed the fat threeridge as endangered and the purple bankclimber as threatened under the ESA in 1998.  Both species occupy the Apalachicola River.  63 Fed. Reg. 12,664 (March 16, 1998).  The Service explained that the fat threeridge was experiencing "limited recruitment at the site representing its best known population."  63 Fed. Reg. at 12,667. It found that Federal actions impacting water quantity were among the factors that may affect these species and their habitat.  63 Fed. Reg. at 12,684.  It emphasized that because these

species' distribution had become so restricted, any adverse modification of occupied mussel habitat "would likely jeopardize their continued existence." *Id.*

56.     In 2003, the FWS published a Recovery Plan for the mussels with the specific goal of restoring viable populations within a significant portion of their historical ranges "to the point where their protection under the ESA is no longer required." *Recovery Plan for Endangered Fat Threeridge, Shinyrayed Pocketbook, Gulf Moccasinshell, Oval Pigtoe and Threatened Chipola Slabshell, and Purple Bankclimber* (2003) ("Mussel Recovery Plan") at iii. According to the plan, "securing the existing subpopulations of the [] species and their habitats is the most important and urgent" objective for achieving recovery "because of the extent of their decline and continuing threats to their habitats." *Id.*   Once the viability of the extant subpopulations is secured, "the next objective is to increase the number of subpopulations and extend their range."

57.     The Service did not designate critical habitat for these two mussels when the species were listed.  However, as a result of a lawsuit, the Service has designated critical habitat for the mussels throughout the Apalachicola River mainstem and many of the key distributaries of the River, including Swift Slough.  72 Fed. Reg. 64,285 (Nov. 15, 2007).

58.     The Service has recognized that the mussels depend on fish hosts to support larval stages of life and that maintaining threshold density of these host fish is integral to the persistence of mussel populations.  According to the FWS, "[t]he construction and operation of dams, water withdrawals, and water diversions may alter features of the flow regime important to the mussels and their host fishes."  72 Fed. Reg. at 64,302.

59.     The "primary constituent elements" of mussel critical habitat are:

> (i) A geomorphically stable stream channel (a channel that maintains its lateral dimensions, longitudinal profile, and spatial

pattern over time without a consistent aggrading or degrading bed elevation); (ii) A predominantly sand, gravel, and/or cobble stream substrate with low to moderate amounts of silt and clay; (iii) Permanently flowing water; (iv) Water quality (including temperature, turbidity, dissolved oxygen, and chemical constituents) that meets or exceeds the current aquatic life criteria established under the Clean Water Act (33 U.S.C. 1251-1387); and (v) Fish hosts (such as largemouth bass, sailfin shiner, brown darter) that support the larval life stages of the seven mussels.

72 Fed. Reg. at 64,314-15.

60.     The BiOp summarizes the Service's current assessment of the status of both purple bankclimber and fat threeridge.  FWS concludes, "Results of extensive sampling in the Apalachicola system from 2005-2007 confirm that the fat threeridge is locally abundant in the appropriate habitat ... from [River Mile] 40 to 50 and the Chipola River and Chipola Cutoff ... ." There appear to be a total of 233,500 fat threeridge in the action area.

61.     The Service acknowledges that "most of the population [of the threeridge] in Swift Slough perished in 2006 and 2007 at flows between 5,000 to 10,000 cfs ... ."  Over 30,000 mussels died in Swift Slough in 2006.  During the summer and fall of 2007, FWS observed additional mortality of fat threeridge at the sites in RM 40-50 and Swift Slough at flows greater than 5,000 cfs.  About 98% of the remaining 18,101 fat threeridge in Swift Slough died in 2007. Most of the mussel mortality FWS observed was in the RM 40-50 reach of the river, either in elevated side channels along the main channel of the river and Chipola Cutoff, or in Swift Slough.

62.     Currently, 45% of all remaining fat threeridge in the River are located between RM 40 and 50.  However, there are only 9 acres of available habitat in this reach (about 12% of the theoretically available habitat in the River).

63.     Combined mortality estimates from Swift Slough and the 7 main channel sites suggest that about 50,000 fat threeridge died at flows greater than 5,000 cfs in 2006 and 2007.

This mortality represents about an 18% reduction of the population size in less than 2 years.  In addition, the Corps estimated that a total of 1,469 individual fat threeridge were taken as a result of the flow reduction to 4,750 cfs under the EDO in November 2007.

64.     FWS concludes, "The impact of the loss of about 18.5% of the population in less than 2 years is substantial.  At this time, therefore, we believe the current population trend for the fat threeridge in the action area is declining."  Subsequently explaining its population viability analysis, FWS concludes:  "[T]he fat threeridge population in the Apalachicola River is in a long-term, relatively slow decline for the foreseeable future."

65.     With regard to purple bankclimber, FWS explained that combined surveys through 2007 yielded only 105 bankclimbers at 11 sites between RM 22.3 and RM 105.5.  FWS explains:  "We do not have population estimates for the purple bankclimber in the action area or a length-age relationship from which to infer population structure, annual survival rates, or year class strength."  Like the fat threeridge, this species also suffered additional mortality at several sites in the Apalachicola River and Swift Slough in 2006 and 2007, although the BiOp explains "the extent of mortality cannot be assessed."  Nevertheless, "The lack of young individuals suggests either poor reproductive success or sampling methods that are not suited to detecting juveniles of this species."

66.     When flows were reduced to 4,750 cfs in late 2007, yet more purple bankclimbers perished below Woodruff Dam.  A total of 46 purple bankclimbers were tagged at that time.  According to FWS, "[t]here was no evidence of movement for almost all of the recaptured tagged bankclimbers.  A few individuals were relocated less than a foot from their original tagging location."

67.     In conclusion, FWS found: "Based on the rarity of the species, potential recruitment problems, and mortality experienced in 2006 and 2007, we classify the purple bankclimber in the action area as declining."  FWS also states: "Recent survey data from the Ochlockonee and Apalachicola rivers suggest possible widespread reproductive failure; therefore, we believe the purple bankclimber may be declining throughout its range."

### The Impact of Corps Operations on the Apalachicola River Species

68.     Congress authorized the Corps to develop and operate certain dam and reservoir projects within the ACF Basin, subject to the requirements of specific statutes and regulations. These projects are:  Buford Dam, which is located on the Chattahoochee River about 35 miles northeast of Atlanta, Georgia, and impounds Lake Sidney Lanier; West Point Dam, which is located on the Chattahoochee River downstream of Atlanta on the boundary between Georgia and Alabama, and impounds West Point Lake;  Walter F. George Lock and Dam, which are located on the Chattahoochee River along the border between Alabama and Georgia, and impound Walter F. George Lake; George W. Andrews Lock and Dam, which are located on the Chattahoochee River directly south of the Walter F. George Lock and Dam, and impound Lake George W. Andrews on the border between Alabama and Georgia;  and Woodruff Dam, which is located immediately downstream of the confluence of the Chattahoochee and Flint Rivers and impounds Lake Seminole near the border between Georgia and Florida, and which release water into the Apalachicola River.

69.     Congress authorized Buford Dam and Lake Sydney Lanier for the purposes of flood control, hydropower and downstream flow maintenance.  *See* Rivers and Harbors Act of 1945, Pub. L. No. 79 14, 59 Stat. 10 (1945); Rivers and Harbors Act of 1946, Pub. L. No. 79 525, 60 Stat. 634 (1946); H.R. DOC. NO. 342, 76th Cong., 1st Sess. (1939); H.R. DOC. NO. 300, 80th Cong., 1st Sess. (1947).  *See also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117,

1122 (11th Cir. 2005) (explaining only flood control, navigation and hydropower are "explicitly authorized purposes"); *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1247 n.1 (11th Cir. 2002).  *See also* Memorandum and Order dated August 9, 2007 (Doc. No. 41).  Only once, in 1956, did Congress allocate storage in Lake Lanier for municipal and industrial water supply, and that was for a minimal amount and for the limited period of fifty years, which has now expired.  *See* Pub. L. No. 841-785, 72 Stat. 725 (1956).

70.     Nevertheless, "the Corps has historically maintained that water supply use is an 'incidental benefit' flowing from the creation of the reservoir."  *Alabama*, 424 F.3d at 1122. Under that theory, since the 1950s, the Corps has authorized or facilitated, through contract or practice, the withdrawal and release of large volumes of water from Lake Lanier for the benefit of municipal and industrial water supply entities in the vicinity of Atlanta, Georgia.  As noted above, the Corps' practice resulted in a "major operational change" without congressional approval and in violation of the Water Supply Act, 43 U.S.C. § 390b(d).  *Southeastern Federal Power Customers, supra.*

71.     Subject to the Congressional authorizations, the Corps exercises control over the amount of water that is retained in and released from the five upstream reservoirs, and the ESA, therefore, applies to the Corps' decisions regarding how much water remains in storage and how much is released for downstream needs.  *See In re Operation of the Missouri River System Litigation*, 421 F.3d 618, 631 (8th Cir. 2005) ("Because the Corps is able to exercise its discretion in determining how best to fulfill the purposes of the reservoir system's enabling statute [the Flood Control Act], the operation of the reservoir system is subject to the requirements of the ESA.").  *See also, id.* at 626 ("The [Corps'] operation of the reservoir system also brings the Corps within the provisions of the [ESA].").

72.     The bulk of the Corps' operational parameters for Lake Lanier and the other reservoirs is contained in the De Facto Plan.  That plan establishes, among other things, the "action zones" that drive the Corps' management of the ACF Basin reservoirs, and a minimum flow "requirement" of 5,000 cfs to the Apalachicola River, both of which the Corps unilaterally adopted without compliance with the Flood Control Act, 33 U.S.C. § 709, its own regulations at 33 C.F.R. § 222.5, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.,* or the ESA.  Although used by the Corps to dictate its operations, this De Facto Plan never has been formally adopted.

73.     The "action zones" apply to each of the major storage projects in the ACF Basin (Buford, West Point and George).  According to the Corps:

> These zones are used to manage the lakes at the highest level possible for recreation and other purposes that benefit from high lake levels.  The actions zones also provide guidance on meeting minimum hydropower needs at each project as well as determine the amount of storage available for downstream purposes such as navigation, water supply, water quality.  These zones were derived based on the past operation of the projects which considered time-of-year, historical pool level/release relationships, operational limits for conservation and recreational resource impact levels.  The action zones are basic guidelines for operating the river system, however there may be other factors and activities that may cause the lakes to operate differently than the zones shown on the graphs.  Some of these factors range from flood control actions, fish spawn operations, maintenance and repair of turbines, emergency situations such as drownings and chemical spills, drawdowns due to shoreline maintenance, releases made to free stuck barges, and other circumstances. http://water.sam.usace.army.mil/zones.htm

74.     "Zone 1 indicates that releases can be made in support of seasonal navigation (when the channel has been adequately maintained), hydropower releases, and water supply, and water quality releases.  If all the lakes are in Zone 1 or above, the river system would operate in a fairly normal manner."  *http://water.sam.usace.army.mil/zones.htm*.  "Zone 2 indicates that water

to support seasonal navigation may be limited.  Hydropower generation is supported at a reduced level.  Water supply and water quality releases are met.  Minimum flow targets are met." *Id.* "Zone 3 indicates that water to support seasonal navigation may be significantly limited. Hydropower generation is supported at a reduced level.  Water supply and water quality releases are met.  Minimum flow targets are met." *Id.*  "Zone 4 indicates that navigation is not supported. Hydropower demands will be met at minimum level and may only occur for concurrent uses. Water supply and water quality releases are met.  Minimum flow targets are met." *Id.*

75.     The Service informed the Corps as early as April 2000 of concerns about the adverse impacts of Corps reservoir operations on the Apalachicola Species.  Florida echoed these concerns to the Service and the Corps.  In August 2000, the Corps knew that some sloughs occupied by protected mussels had been dewatered, or that the water level within them had been significantly lowered, by releases from Woodruff Dam of 5,000 cfs.  The Corps and Service personnel observed significant numbers of dead mussels in dewatered tributaries and sloughs along the River.  The fat threeridge and purple bankclimber were among the species harmed.

76.     In April 2002, the Corps reduced releases from Woodruff Dam during the spring fish spawn on the Apalachicola River.  As a result of reduced flows on the River below the dam, as had occurred in 2000, fish spawning beds were dewatered and sloughs and tributaries were disconnected.  Several rock ledges located below the dam (believed to serve as spawning habitat for the Gulf sturgeon) were dewatered and exposed during periods when the sturgeon was likely in spawn.

77.     In June 2002, the Service reiterated its belief to the Corps that formal ESA Section 7 consultation should not be delayed further.  Florida requested that formal consultation occur.  The FWS later informed the Corps that "operations under the present drought appear to

us to have the potential for take [in violation of ESA Section 9]." The Service explained that the Corps' operations were likely adversely impacting the Gulf sturgeon in several ways, including the destruction of sturgeon eggs or larvae following spawning and interrupting or precluding spawning by modifying the depth of water over the few rock ledges at which spawning occurs.

78.     Despite the admonition of the FWS and the requests from Florida, the Corps steadfastly refused to enter into formal consultation with the Service for years, instead resorting to an *ad hoc*, loose-knit string of informal meetings to discuss specific operations during low-flow conditions. Finally, but only as a result of Florida's seeking a preliminary injunction to compel formal consultation, the Corps initiated that consultation. The Corps did so before responding to Florida's injunction request.

### *The Corps' Decision to Consult on the IOP*

79.     On March 7, 2006, by letter of the same date, the Corps initiated formal consultation with the FWS concerning the IOP. Of greatest concern to Florida was the flow regime that resulted from adherence to the IOP as observed in 2006. Under that regime, for example, flows in the Apalachicola River were reduced at key spawning locations below the dam during the Gulf sturgeon spawning season, potentially exposing eggs and larval fish. At various times, approximately 50% of all known Gulf sturgeon spawning habitat in the River was made unavailable by lowered releases called for under the IOP. In addition, approximately 15% of the habitat was completely out of the water, exposing any eggs that might have been laid in those locations.

80.     Similarly, flows were reduced in the River and slough areas known to hold high concentrations of federally protected mussels. The Corps acknowledged that "impacts to protected mussels may potentially occur whenever flows are less than 8,000 cfs." *Id.* at 19. The Corps further explained that "… a significant percentage of listed mussel species occur at

substrate depths that may be exposed by flows between 5,000 and 7,000 cfs."  Moreover, the Corps "estimated that at NM [nautical mile] 73.3 the following percentages of A. neislerii [fat threeridge] would be exposed at reduced discharge:  49.1% (6,000 cfs), 53.9% (5,000 cfs), 67.9% (4,000) cfs, and 85.4% (3,000 cfs)."  Yet, the Corps reduced flows to just 5,000 cfs in the summer of 2006, killing large numbers of mussels in the River.

81.     Shortly after explaining its plan for flow management under the IOP, the Corps, on June 12, 2006, made a seemingly innocuous, but extraordinarily damaging change to the IOP – one that departed from the Corps' long-held practice of measuring compliance with flow requirements at Woodruff Dam.  The Corps informed the FWS on June 12, 2006 of a series of changes to the IOP, including that flow measurements would henceforth be conducted at the Chattahoochee gage downstream of Woodruff Dam.  Due to dam seepage and other inflows below the dam, the flow at the Chattahoochee gage is approximately 400-600 cfs higher than at Woodruff Dam.  Thus, as a practical matter, while the Corps used to maintain a discharge from Woodruff Dam of 5,000 cfs (5,400-5,600 at Chattahoochee), the Corps now maintains a discharge from Woodruff of 4,400-4,600 at the dam (5,000 at Chattahoochee).  As a result, flows in the River under the IOP were reduced to a level lower than ever had been experienced before. The FWS never has acknowledged or evaluated the impact of this change on the River or the Apalachicola Species.

***Impacts of the IOP in the Summer of 2006***

82.     In the summer of 2006, the Corps attempted to operate in conformance with the IOP.  When the Corps reduced flows precipitously from 8,000 cfs to just over 5,000 cfs, Florida observed significant mussel mortality in the mainstem of the Apalachicola River and in other important habitats, including Swift Slough.  Florida accordingly sought and obtained a temporary restraining order in the Northern District of Alabama against the Corps requiring it to increase

releases to the River.   Pursuant to a subsequent agreement lasting four weeks, the Corps maintained releases in the Apalachicola River that were approximately 1,000 cfs higher than called for in the IOP.

83.     The agreement was set to expire after the Service issued the BiOp, which initially was scheduled to be released on July 21, 2006.   Immediately after the agreement was secured, the federal agencies announced that the consultation would be extended until September 5, 2006.   When the agreement expired on July 24, 2006, the Corps resumed operations under the IOP by reducing releases to the Apalachicola River.   Florida unsuccessfully sought an additional temporary restraining order to again raise flows in the Apalachicola River.   Thus, from July 24, 2006, until February 28, 2007, the Corps operated under the IOP, and flows were lowered to 5,000 cfs.

84.     Implementation of the IOP during the summer of 2006 had a significantly adverse impact on important occupied mussel habitats once connected to the mainstem of the Apalachicola River.   Prior to the Corps' reduction of River flows, Swift Slough (one of the main sloughs that are part of the FWS' critical habitat designation) contained a core population of up to 30,000 individual fat threeridge mussels.   Defendant Carmody, in sworn testimony, called this one of the "highest density fat threeridge mussels beds (*sic*) known."   Declaration of Gail Carmody ¶ 5(f) filed in *Alabama v. U.S. Army Corps of Eng'rs*, CV 90 BE-1331-E (D. Ala.).

85.     As the result of the IOP's flow regime, for the first time in recorded history, Swift Slough was disconnected in 2006 from the mainstem of the Apalachicola River.   Mussel mortality rates in Swift Slough soared to 30% at the end of July 2006 and increased thereafter.

86.     When Swift Slough became disconnected, the Corps was releasing only enough water from upstream reservoirs to maintain a flow of 5,000 cfs in the River.   At the same time

27

the Corps was maintaining 5,000 cfs in the Apalachicola River (now measured at the Chattahoochee gage, below Woodruff Dam), the Corps was holding back water in the upstream reservoirs that could have been used to mitigate the adverse impacts being experienced along the Apalachicola River.

87.     The Service previously explained with regard to the mussels:

> … the Service has applied an analytical framework for jeopardy analyses of the seven mussels that relies heavily on the importance of core area populations to the mussels' survival and recovery. The section 7(a)(2) analysis is focused not only on these populations but also on the habitat conditions necessary to support them. … Generally, if a proposed Federal action is incompatible with the viability of the affected core area population(s), inclusive of associated habitat conditions, a jeopardy finding is considered to be warranted, because of the relationship of each core area population to the survival and recovery of the species as a whole.

71 Fed. Reg. at 32,764.  As explained below, in its 2006 BiOp, contrary to the teaching of this regulation, the FWS discounted the disconnection of Swift Slough as an anomalous event not significant in relation to the mussel species.

### The FWS' Issuance of the 2006 BiOp and the Development and Approval of "Concept 5"

88.     The FWS issued its original biological opinion evaluating the effect of the IOP on September 5, 2006 ("2006 BiOp").  Remarkably, the 2006 BiOp concluded that the IOP would not likely jeopardize any listed species and will not appreciably diminish the value of critical habitat for the Apalachicola Species. Therefore, the 2006 BiOp did not include an RPA to the IOP.  The 2006 BiOp concluded that the IOP would not result in take of Gulf sturgeon.  The BiOp, therefore, included no ITS for Gulf sturgeon.  The 2006 BiOp did, however, conclude that the IOP would result in incidental take of mussels and, therefore, contained an ITS that authorized the Corps to take, primarily through habitat modification, individual mussels.

89.     The ITS included RPM 3 to deal specifically with drought "mitigation" flows. RPM 3 provided the Corps shall:  "Develop modifications to the IOP that provide a higher minimum flow to the Apalachicola River when reservoir storage and hydrologic conditions permit."  The Corps explored various concepts regarding implementation of RPM 3 in late 2006 and early 2007.  Florida provided extensive technical input to the Corps explaining how a higher base flow of between 5,700 cfs and 6,300 cfs could be maintained at all times in the Apalachicola River if certain operational adjustments were made.  The Corps, however, summarily rejected Florida's input, in part because the Corps concluded Florida's suggestions could not be implemented since they were outside the scope of the Corps' De Facto Plan – a plan never formally adopted, but nevertheless, implemented without compliance with the Flood Control Act, the Corps' regulations, or the Nation's environmental laws, including the ESA.

90.     When the 2006 BiOp was issued, the Service had determined that a minimum Apalachicola River flow of 6,000 cfs was needed to minimize the impact of authorized take of mussels.  The Corps acknowledged that maintenance of such a flow was hydrologically possible without any adverse impact on upstream municipal and industrial water supplies.  But, the Corps believed that maintenance of such a flow would harm recreation in its upstream lakes and argued that it would not allow enough water to remain in storage under a worst-case drought scenario, which the Corps analogized to Hurricane Katrina.  The Service ultimately elected not to mandate a 6,000 cfs flow as an RPM, but rather merely to encourage the Corps to do its best to provide more water when it can comfortably do so.  That encouragement took the form of RPM 3.

91.     The Service approved the Corps' RPM 3 plan – "Concept 5" – on February 28, 2007, nearly six months after the 2006 BiOp was issued and Florida's original Complaint was filed.  As explained in the Corps' *Environmental Assessment, Modifications to Interim Operation*

*Plan for Support of Endangered and Threatened Species, Jim Woodruff Dam* (March 6, 2007) ("EA") and associated *Finding of No Significant Impact* ("FONSI"), Concept 5 modified the flows that were experienced under the original IOP ostensibly to allow the Corps to store more water and hopefully sustain a higher minimum flow for as long as the Corps deemed reasonable.

92.     Therefore, under the modified IOP, the Corps would increase storage during the spring and support a higher (6,500 cfs) release in the summer, until the Corps determined that there was not enough water to sustain the higher flow, at which time flows would revert to 5,000 cfs as identified in the original IOP.  The Corps' decision to revert from a flow of 6,500 cfs to 5,000 cfs would be based on the amount of "composite storage" in the Chattahoochee River reservoir system, which in turn was based on and measured against the action zones established in the De Facto Plan.  The flow minimum was set at 6,500 cfs as long as composite storage was above "Zone 3."  When composite storage fell into Zone 3, the Corps would immediately reduce flows to 5,000 cfs until composite storage increased back to "Zone 1."

### Additional Impacts of the Modified IOP During 2007

93.     Operations under the modified IOP, although supposedly developed for the sole purpose of minimizing the impact of authorized take on the mussel species, resulted in the mussels experiencing the longest continuous period of flow at 5,000 cfs at any time in recorded history.  Mussels suffer adverse impacts at flows as high as 10,000 cfs, and a large percentage of surveyed mussels at one time resided at levels inundated only at flows above 5,000 cfs.  Swift Slough is entirely disconnected from the main channel of the Apalachicola River at a flow of 5,000 cfs.  Many more mussels in the River died as a result of the modified IOP.

94.     On information and belief, when approving the modified IOP, the Service accepted the Corps' contention that the Corps was somehow legally bound by, or that the Corps' discretion was limited as a matter of law under, the De Facto Plan.  Therefore, the Service did

not question the Corps' erroneous contention that it could not legally support a minimum flow greater than the minimum flow requirement of 5,000 cfs established in the De Facto Plan.

95.    Rather than minimizing the impact of take on the mussel species, the modified IOP resulted in less floodplain inundation during the spring and prolonged the periods of lowest flow in the Apalachicola River, thereby having a greater negative impact on protected mussels than the original IOP.  Concept 5 and the modified IOP therefore increased the negative impact on the mussel species.

### The Corps' Non-Compliance with the modified IOP and the Service's Concurrence in the Corps' Explanation and New Accounting Procedures

96.    Under the modified IOP, the Corps was required, from March through May, to deliver at the Chattahoochee gage a daily average flow equivalent to the 7-day moving average "Basin Inflow" for the preceding seven days whenever "Basin Inflow" receded below 18,000 cfs. In March and April 2007, the Corps violated its own modified IOP by failing to deliver water at the Chattahoochee gage on this schedule.  The Corps under-released by approximately 64,000 acre-feet of water from March 1 through April 16, 2007.  Florida, on April 19, 2007, served upon the Corps and other federal officials a 60-day Notice of Intent to Sue for this and other violations described herein pursuant to Section 11 of the ESA.  The Corps then initiated informal consultation with the Service and developed a revised accounting procedure to explain away its violation.

97.    After nearly one month of "informal consultation" with the Service, the Corps issued a letter on May 16, 2007 asserting that Florida was incorrect, but that, nevertheless, the Corps was planning to "reset" the accounting based on a newly developed accounting procedure. The Corps indicated that, as between the agencies, any accounting discrepancies had been resolved by virtue of the Corps' retroactive application of the new accounting procedure, which

the Corps applied as if it had been in place since September 5, 2006 when the 2006 BiOp originally issued.  On information and belief, the Corps concluded that neither its violation of the modified IOP, nor its newly adopted accounting procedure, would adversely affect any species or critical habitat in the Apalachicola River.  The Service concurred in the Corps' determination.  This is true notwithstanding the fact that, under the Corps' new accounting procedures, the Corps could accumulate a large amount of water as a "credit" that it could withhold even during the most extreme drought conditions.  Even during the relatively wet months of January and February 2007, the Corps credited itself approximately 159,000 acre-feet of storage credits, which were then relied on (again retroactively) to excuse under-releases occurring during what is recognized as the Gulf sturgeon spawning period in March and April 2007.

### The Corps' Adoption and Implementation of the EDO

98.     Throughout 2007, the ACF Basin suffered an extraordinary period of extended low Basin Inflow.  As a result of those low inflows, and unmitigated upstream consumption, more and more water had to be released from Lake Lanier and other upstream reservoirs to sustain the minimum flows called for under the modified IOP.

99.     Georgia filed a request for injunctive relief with this Court on October 19, 2007, seeking to force the Corps to curtail releases from Lake Lanier.  The Water Suppliers supported that request.  In addition, Georgia's congressional delegation introduced a bill authorizing suspension of the ESA during a Corps or State-declared drought emergency.  The bill did not progress through Congress and, on information and belief, is not being pursued by Georgia's delegation.  Georgia's Governor also sought a Presidential declaration of drought emergency and an executive exemption from the ESA.  Neither was granted.

100.     Georgia waited throughout the summer of 2007 to institute meaningful water use restrictions in the Atlanta metropolitan area, refusing to employ its most aggressive measures

until September 28, 2007.  Despite the Flint River's importance to the overall flow of the Apalachicola River, Georgia took no action to constrain depletions from that river at any point during 2007.

101.    On November 1, the Corps announced its plan to implement the EDO and initiated formal consultation with FWS on the same.  The EDO exacerbated the adverse impacts of prior operations by reducing further the minimum flow available to the Apalachicola River and allowing the Corps to store 100% of the water that would otherwise flow to the Apalachicola from the Chattahoochee River.  Therefore, while prior operations generally required the Corps to pass Basin Inflow to the Apalachicola River during biologically critical periods, the EDO called for affirmative capture of Basin Inflow and alteration of the flow regime on which the Apalachicola Species – particularly Gulf sturgeon – rely during the critical spawning period.

102.    The EDO, like the modified IOP, was based on the amount of composite storage remaining in the upstream reservoirs as measured against the Corps' "action zones."  Thus, the EDO was "triggered" whenever composite storage fell into Zone 4.  While the EDO was in place, and composite storage was in Zone 4, all provisions of the modified IOP would be suspended, including minimum flow support, ramping limitations and volumetric accounting provisions designed to minimize the impact of take.  FWS agreed the Corps could reduce flows to 4,500 cfs so long as composite storage was in Zone 4 and until composite storage recovered to Zone 3.  Once composite storage returned to Zone 3, the Corps would again provide a minimum flow of 5,000 cfs at the Chattahoochee gage as contemplated under the modified IOP.  However, all other provisions of the modified IOP remained suspended until composite storage recovered to Zone 2.

103.    The Corps supported its request for consultation on the EDO with a biological assessment comparing the effects of the EDO to the effects of the modified IOP, which formed the "environmental baseline" for the analysis.  In other words, the Corps grandfathered in the effects of the modified IOP and all operations prior to it (including the De Facto Plan), without examining the cumulative impact of the EDO in light of the impacts of prior operations.

104.    The Corps explained the EDO reduced the amount of available Gulf sturgeon spawning habitat.  The Corps noted that high salinity levels in the Bay might result from the EDO, but concluded these were the result of drought and "not discretionary actions on the part of the Corps."  The Corps concluded the EDO would decrease the amount of floodplain connectivity due to the EDO's allowance for storage of all Basin Inflow above that required to meet minimum flow levels prescribed by the EDO.

105.    The Corps justified these impacts on the basis that continued operation under the modified IOP would preclude the Corps from providing future flow support (e.g., in late 2008) for protected mussels if hydrologic conditions did not improve.  The Corps argued that "composite conservation storage" in the upstream reservoirs could be drained by mid-2008.

106.    "Conservation storage" is the amount of storage the Corps normally uses to meet its various operating objectives, but is not the total amount of storage available, more of which can be accessed to meet those objectives.  By way of illustration, conservation storage in Lake Lanier accounts for approximately 56% of total storage in that reservoir.  There are 1,049,400 acre-feet of water in conservation storage (above elevation 1035') in Lake Lanier. Approximately 44% of total storage at Lake Lanier exists in the so-called "inactive" storage pool.  Even when conservation storage is drained completely, there remain 867,600 acre-feet in the inactive storage pool at Lake Lanier, which may be accessed.  "Composite conservation

storage" is the sum of all conservation storage in the various upstream reservoirs. There remains at least 1.8 million acre feet (or roughly 44% of total storage) in the upstream reservoir system even when "composite conservation storage" is exhausted.

107.    The Corps' projection that composite conservation storage would be exhausted as a result of the modified IOP was based on an unprecedented, worst-case scenario concerning likely future Basin Inflow. For purposes of the analysis the Corps used two scenarios: "1) an unprecedented, exceptional drought applied across the entire ACF basin and continuing without relief for a two year period (referred to as the 10 percent hydrology); and 2) an exceptional drought that reflects differences in precipitation within the basin but is still more severe (20 percent reduction) than observed during the critical period prior to the current drought (referred to as the 1999-2001 20 percent reduced hydrology)." The Corps acknowledged "[i]t is unlikely that the actual hydrology occurring over the next two years will match closely these simulated hydrologic conditions."

### The Service's Issuance of the 2007 BiOp

108.    The Service issued another biological opinion on November 15, 2007 ("2007 BiOp") analyzing the EDO in two weeks, a period nearly four months shorter than that called for under the Service's consultation regulations. 50 C.F.R. § 402.14.

109.    In the intervening period between the 2006 BiOp and 2007 BiOp, the Service acquired virtually no new information concerning the status of Gulf sturgeon in the Apalachicola River. The Service, however, "learned that the fat threeridge population may have been substantially reduced in the past ten years and estimated 234,000 individuals existed in late 2007. The Service also stated that despite prior speculation to the contrary in the 2006 BiOp, the Service "now believe[s] that poor recruitment and/or survival of the last nine year classes is occurring." The Service's knowledge concerning purple bankclimbers "ha[d] not substantially

increased since the [2006 BiOp]." The Service still had no idea how many purple bankclimbers inhabited the River, and the Service "[did] not know the extent and viability of many subpopulations throughout the range of the species."

110.   The Service evaluated the impact of the EDO against a baseline that included then existing operations – the modified IOP. The analysis in the 2007 BiOp thus "focuse[d] on how a short-term proposed change to the [modified] IOP may affect listed species and designated critical habitat." The 2007 BiOp's "effects analysis compare[d] only two operational schemes, the IOP and the [EDO]." The 2007 BiOp, like its predecessor, did not account for the past impact of operations conducted under the De Facto Plan.

111.   Based on the fundamental premise that operation under the modified IOP would result in exhaustion of conservation storage during 2008, the Service concluded the EDO was biologically preferable to the modified IOP. Nevertheless, the 2007 BiOp contained some extraordinary conclusions regarding the adverse impact of the EDO and a series of even more extraordinary admissions about the Service's inability to analyze the EDO as required by ESA Section 7.

112.   For example, the Service concluded the EDO would result in lower overall flows than the modified IOP during the period of analysis (December 1, 2007 through May 31, 2008). The Service concluded that the EDO would reduce Gulf sturgeon spawning habitat (e.g., in one modeled scenario, from a paltry 13 acres under the Modified IOP to just 10.6 under the EDO) and explained that such reduced availability "may result in reduced spawning success." The Service also found the EDO would increase (from zero) the number of days at which flows would be below 5,000 cfs during the period analyzed.

113.    On more difficult issues, the Service conducted no real analysis.  For example, despite recognizing the importance of Apalachicola Bay salinity, the Service looked simply at the number of days in which flows would recede below 16,000 cfs under the EDO versus the modified IOP.  Because there was little chance flows would be that high under either the EDO or the modified IOP, the Service concluded the EDO had no incremental impact at all.  However, the Service failed to explain what relevance – if any – a flow of 16,000 cfs has on Bay salinity.  The Service never analyzed whether or not the EDO might increase salinity at lower flow thresholds, dismissing data presented by Florida showing salinity fluctuations in the Bay as a result of the IOP, modified IOP and EDO.

114.    Similarly, the Service completely dismissed the impact of the EDO on floodplain inundation.  Despite recognizing floodplain inundation as "critical to the movement of organic matter and nutrients into the riverine feeding habitats of both the mussels and juvenile sturgeon, and into the estuarine feeding habitats of juvenile and adult sturgeon[,]" the Service simply stated floodplain connectivity is "extremely limited under all IOP and EDO models[.]"  The Service ignored the fact that in certain scenarios the EDO reduced the extent of floodplain inundation by over 50% and dismissed data provided by Florida showing the importance of such inundation to fish production (including mussel hosts).

115.    In evaluating how Gulf sturgeon would be impacted by the EDO, the Service speculated the "reduction in habitat availability of 1 to 3 acres due to the EDO in the spring is probably not significant."  The sole support offered for this assessment was the fact that similar limitations on habitat availability occurred in the past.  The 2007 BiOp, however, included no analysis of the biological significance of this occurrence or the impact of its continuation under the EDO.

116.    The Service summarily concluded that mussel host fish (a PCE for mussel critical habitat) would not be seriously impacted by the EDO because "the river will provide very poor conditions for spawning success and recruitment under either operating plan."

117.    When analyzing whether the EDO would adversely modify critical habitat for all three Apalachicola Species, the Service blamed drought.  Thus, despite finding the EDO would reduce Gulf sturgeon spawning habitat under all scenarios, the Service inexplicably concluded: "Droughts substantially change the nature of all of [the primary constituent elements] compared to normal flows, but we are unable to determine that the EDO would appreciably change the quantity or quality of the [primary constituent elements] relative to the IOP under the same drought conditions."  The Service reiterated the same with regard to mussel critical habitat.

118.    Notwithstanding the detrimental impacts FWS could define, and the exceptional dearth of analysis on key issues, the 2007 BiOp concluded the EDO would not jeopardize the Apalachicola Species and would not result in the adverse modification of their critical habitats. The Service made its "no jeopardy" and "no adverse modification" determinations without knowing how or when the Corps would ultimately reduce flows in the River.  The 2007 BiOp explained that "appropriate triggers or criteria for when reductions to 4,500 cfs and then to 4,150 cfs would occur are still to be developed."  The Corps did not provide the additional information concerning the flow reduction triggers until December 2007, two weeks after the 2007 BiOp was issued.

119.    The 2007 BiOp concluded the EDO would take mussels and, therefore, included a revised ITS.  Although the 2007 BiOp explained that only 101 purple bankclimbers had been located as a result of combined survey efforts, the revised ITS authorized the taking of nearly all (100) of the River's purple bankclimbers.  The only RPM associated with the EDO was RPM 6.

The only requirement imposed by RPM 6 was that the Corps "[d]etermine the appropriate triggers or criteria to indicate when the EDO will provide for reductions in the minimum flow from 4,750 cfs to 4,500 cfs, and from 4,500 cfs to 4,150 cfs."

### *Implementation of the RIOP*

120.    On April 15, 2008, the Corps issued and initiated ESA Section 7 consultation on the RIOP, a modification of the prior IOP, which is a definition of temporary discretionary operations within the limits and rule curves established by the De Facto Plan.  Although no waiver was sought to provide the higher (6,000 cfs) flow the FWS deemed necessary to protect mussels in 2006, the Corps obtained a temporary waiver from the De Facto Plan to provide for minimum releases less than 5,000 cfs from Woodruff Dam when the appropriate triggers are met and to allow additional temporary storage at the Walter F. George and West Point projects.

121.    Operations under the RIOP will be implemented and continued until such time as additional formal ESA Section 7 consultation may be initiated and completed, such as in association with a proposed update and revision of water control plans for the ACF system.  *See* 73 Fed. Reg. 54,391 (Sept. 19, 2008).

122.    Like the Corps' prior operations, the RIOP varies minimum discharges from Woodruff Dam by "Basin Inflow".  Various amounts of water are released from the Corps' reservoirs (or stored for the benefit of upstream uses) based on the amount of Basin Inflow the Corps calculates in the ACF Basin at any given time.  Basin Inflow is calculated based on the volume of water entering the Corps' reservoirs from the Chattahoochee and Flint Rivers (*i.e.*, after upstream water withdrawals, including those the D.C. Circuit has deemed unauthorized, have occurred).  Thus, the extent of water withdrawals (from either ground water or surface water) in the ACF River Basin bears directly on the Corps' operations under the IOP.  Those withdrawals reduce the amount of water available to the Apalachicola River Species because,

simply put, the higher the withdrawals, the less water is available in the Corps' reservoirs. Thus, Basin Inflow as used by the Corps actually is the net amount of water available after subtracting upstream depletions from the total inflow to the Basin.

123.    The IOP and modified IOP required the Corps to bypass all Basin Inflow to the River during the Gulf sturgeon spawning season. The RIOP allows the Corps to capture Basin Inflow even during the Gulf sturgeon spawning season and to actively reduce the flow of water in the Apalachicola River while spawn is occurring.

124.    The RIOP incorporates composite storage thresholds that factor into minimum release decisions. Composite storage is calculated by combining the storage of Lake Sidney Lanier, West Point Lake, and Walter F. George Lake. The composite storage utilizes the four Zone concepts as well (i.e., Zone 1 of the composite storage represents the combined storage available in Zone 1 for each of the three storage reservoirs).

125.    The RIOP defines Basin Inflow threshold levels that vary by three seasons: spawning season (March-May); non-spawning season (June-November); and winter (December-February). During the spawning season, two sets of four Basin Inflow thresholds and corresponding releases exist based on composite storage. During the non-spawning season, one set of four Basin Inflow thresholds and corresponding releases exists based on composite storage in Zones 1-3. During the winter season, there is only one Basin Inflow threshold and corresponding minimum release (5,000 cfs) while in composite storage Zones 1-3. There are no Basin Inflow storage restrictions as long as this minimum flow is met under these conditions. When composite storage falls below the bottom of Zone 3 into Zone 4 a drought plan is "triggered".

126.    The drought plan is similar to the EDO in that it specifies a minimum release from Woodruff Dam and temporarily suspends the other minimum release and maximum fall rate provisions until composite storage within the basin is replenished to a predetermined level. The minimum discharge is determined in relation to composite storage only and not average Basin Inflow under the drought plan.  The drought plan is "triggered" when composite storage falls below the bottom of Zone 3 into Zone 4.  At that time all the composite storage Zone 1-3 provisions, designed to benefit the Apalachicola species (seasonal storage limitations, maximum fall rate schedule, minimum flow thresholds, and volumetric balancing accounting) are suspended and management decisions are based on the provisions of the drought plan.

127.    The drought plan prescribes two minimum releases based on composite storage in Zone 4 and an additional zone referred to as the Drought Zone.  The Drought Zone represents a volume of water roughly equivalent to the inactive storage in lakes Lanier, West Point and Walter F. George plus Zone 4 storage in Lake Lanier.  When the composite storage is within Zone 4 and above the Drought Zone, the minimum release from Woodruff Dam is 5,000 cfs and all Basin Inflow above 5,000 cfs that is capable of being stored may be stored.  Once the composite storage falls below the Drought Zone, the minimum release from Woodruff Dam is an unprecedented 4,500 cfs and all Basin Inflow above 4,500 cfs that is capable of being stored may be stored.

128.    The RIOP does not change the Basin Inflow calculation, use of the Chattahoochee gage to measure river flow, or use of volumetric balancing as described in the May 16, 2007 letter to FWS.

*FWS's 2008 BiOp*

129.    On June 1, 2008, FWS issued the BiOP analyzing the effects of the RIOP over the

next five years (through June 2013).

130.    With regard to the environmental baseline employed in the BiOP, FWS explains:

> The action under review is the Corps' RIOP for the releases from Woodruff Dam.
> In the case of an ongoing water project, such as Woodruff Dam, the total effects
> of all past activities, including the effects of its construction and past operation,
> current non-federal activities, and federal projects with completed section 7
> consultations, form the environmental baseline (USFWS 1998b).

> ... Not all Federal actions in the ACF basin have undergone consultation with the
> Service regarding potential effects to listed species. In particular, the construction
> of the Corps' dams, which preceded the Act and the listing actions for the
> sturgeon and mussels, continue to affect the Apalachicola River by trapping
> sediment in reservoirs that would otherwise move as bed load through the system.
> The interruption of this bed load movement is a major factor contributing to
> altered channel morphology, which we address in this section. However, no
> present discretionary Federal action, per se, perpetuates sediment trapping that
> would prompt a consultation, and as stated above, we include the effects of
> project construction in the baseline. Consultations regarding water supply storage
> contracts, hydropower contracts, and the water control master operations manual
> are expected in the future.

131.    The "baseline", as described by FWS, includes extensive adverse changes to the

River.  In the past 50 years, many portions of the Apalachicola have substantially declined in

elevation (incised) and/or become substantially wider.  This decline is greatest in the upper river.

During the period 1954 to 2004, the stage equivalent to 10,000 cfs declined by 4.8 ft.  It now

takes approximately 10,000 cfs more flow in the upper portions of the River (i.e., where purple

bankclimbers reside and Gulf sturgeon spawn) to inundate the same amount of habitat inundated

in 1954.

132.    FWS evaluated the impact of the RIOP relative to a baseline that included the

IOP, modified IOP and the De Facto Plan.  Explaining its comparative analytical approach, FWS

states:  "Determining effects to the species and their habitat in the baseline flow regime is an

evaluation of the degree to which the natural flow regime in the action area has been altered to date by all anthropogenic factors, including past operations of the Corps' ACF projects. Determining effects of the RIOP is an evaluation of the degree to which the baseline flow regime may be further altered by operations under the RIOP."

133.    Elaborating, FWS explains:

The Corps' full complement of ACF projects was not completed until October 1974, when operations of West Point Reservoir began.  Although we could use all 50 post-Lanier years as the flow baseline, we use only the post-West Point years, 1975 to 2007 (33 years), because this period is the full history of the present configuration of the Corps' ACF projects.

The Corps' operations have changed incrementally over the post-West Point period. These changes were documented in [the De Facto Plan]. Additional incremental changes in water control operations have occurred since 1989, and are reflected in the current operations and the RIOP.

134.    In explaining the other purposes for which the ACF reservoirs must be operated, FWS assumed the Corps was to operate them, in part, for water supply.  Notably, FWS did not acknowledge the holding of the D.C. Circuit in *Southeastern Federal Power Customers*.  Rather, FWS erroneously assumed the Corps was still required to implement the settlement agreement vacated by the Circuit Court.  According to FWS:  "Actions associated with the specific purposes listed above [*e.g.,* water supply, hydropower, navigation] have not yet undergone the section-7 consultation process for effects to listed species in the Apalachicola River."

135.    In the category of "baseline" impacts, FWS explains the "effect of bed degradation and channel widening has been to reduce the amount of floodplain inundation associated with a given discharge ... .  For example, the amount of floodplain habitat inundated by a flow of 30,000 cfs was about 46,500 acres in the pre-Lanier period and about 35,000 acres in the post-West Point period, a 25% reduction.  Floodplain inundation during the growing

season (generally April through October) is critical to the reproduction of many fish species, including some identified host species for the listed mussels."

136.    In addition:  "The frequency and extent of floodplain inundation during the post-West Point period is decreased relative to the pre-Lanier period, largely due to altered channel morphology.  For example, 20,000 floodplain acres were inundated for 32% of the growing-season days in the pre-Lanier period, but for only 18% of the growing-season days in the post-West Point period."  Moreover:  "In 50% of the pre-Lanier years, more than about 23,500 floodplain acres were inundated for at least 30 continuous growing-season days.  The median for the post- West Point period is less than half this amount, about 11,000 acres."

137.    FWS also regulates key discretionary operations called for under the De Facto Plan to the baseline:

> The Corps generally begins refilling West Point reservoir to its summer pool level sometime in February, which reduces, not increases, flow to the Apalachicola River. Higher flow during February and March, therefore, suggests possible climatic differences between the two periods, but since the average annual flow of the two periods is comparable (Figure 3.3.3.A), the post-West Point period must necessarily also contain months with lower flow than the pre-Lanier period. These months appear to be April, May, July, and August, which show a generally lower distribution of monthly flow. The Corps' project operations may explain to some degree lower flow in April and May, since the system is generally operated to fill the reservoirs to summer pool levels by the end of May, and this necessarily reduces flow to the Apalachicola. Lower flow in July and August is likely a combination of climatic differences in the two periods, higher consumptive uses, as well as reservoir operations.

138.    The "principal factor" FWS examines in the BiOp is the flow regime of the Apalachicola River and how the flow regime affects habitat conditions for the listed species. Demonstrating the full impact of the IOP, modified IOP and the EDO (all "baseline" operations), FWS explains:  "In 2007, flows were around 5,000 cfs from May through mid-November, and the EDO operations resulted in flow less than 5,000 cfs and as low as 4,750 cfs for 31 days from

November 16 to December 16.  Therefore, unless wet years bring higher flows, we expect that corresponding elevation to be the new 'ceiling' for mussel presence in the action area."

139.    FWS then evaluates the incremental impact of the RIOP.  To determine the future effect of continued project operations as prescribed by the RIOP, FWS compares the environmental conditions expected under the RIOP to the environmental baseline.

140.    Not surprisingly, employing its "comparative" analysis, FWS concludes that on many points the RIOP is biologically preferable to the baseline (particularly the EDO).  However, the RIOP also has significant adverse impacts.  For example, "[t]he median amount of connected habitat under the RIOP (acres inundated for half of the growing season days 1975-2007) is 1,637 acres, compared to 2,435 ... for the Baseline ... ."  The BiOp projects drought contingency operations (*e.g.,* the lowest flow regime) will be in effect for 1,281 days in the simulation from 1975 to 2007 (10.6% of the time).  According to FWS, "[e]xtreme low flows are likely among the most stressful natural events faced by riverine biota."  FWS also finds the combination of low- and high-flow alterations evident in the RIOP relative to the baseline may adversely affect the extent or suitability of Gulf sturgeon estuarine feeding habitats.  The possibility of rapidly declining stages, especially during drought plan operations, could also expose Gulf sturgeon eggs and larvae.

141.    Changes in River flow timing impact mussels throughout the spring and summer.  The fat threeridge and purple bankclimber spawn at different times.  Female fat threeridge "appear to be gravid in Florida when water temperatures reached 75.2°F, in late May and June, suggesting that the species expels glochidia in the summer."  Females of the purple bankclimber appear to be gravid from February through April.  FWS acknowledges that mussels may be

"particularly susceptible to exposure by low flows during the spawning season, which, for the fat threeridge, occurs in the late spring and early summer."

142.    Regarding the impact on purple bankclimbers below Woodruff Dam, FWS states that decreasing water levels further will harm some fraction of the bankclimber population at this site, but FWS could not determine the size of that fraction.  Yet, FWS anticipates take of a "small number (less than 200)" of purple bankclimbers if flows are reduced to 4,500 cfs.  FWS could not evaluate the relative extent of that take because FWS does not have a population estimate for the purple bankclimber in the Apalachicola River.

143.    Nevertheless, FWS finds:

> ... the RIOP would have a measurable, but not appreciable impact on the survival and recovery of the purple bankclimber if flows are reduced to 4,500 cfs. Bankclimbers are rarely found at stages greater than 4,500 cfs in the Apalachicola. While the RIOP may also adversely affect purple bankclimber critical habitat primary constituent elements by reducing minimum releases to 4,500 cfs, the circumstances triggering this action would occur infrequently, if ever. We do not anticipate that reducing minimum releases to 4,500 cfs once in the next 5 years would alter or affect the critical habitat in the action area to the extent that it would appreciably diminish the habitat's capability to provide the intended conservation role for purple bankclimber in the wild.

144.    FWS projects that additional reductions under the RIOP that lower river stage by up to 0.6- ft (4,520 cfs minimum flow) could result in an additional 9% mortality of fat threeridge.  FWS finds:

> [A] low-flow event occurring once or twice in a 69-year period in the Apalachicola River and thereby reducing the survival of all stages of fat threeridge by about 9%, could adversely affect the long-term growth dynamics of a population that is already declining, such as when adult survival is lower ($p_{Ad}$=0.89). … As discussed in Chapter 3.5.2.2, we believe the fat threeridge population in the Apalachicola River is in a long-term, relatively slow decline largely as a result of drought conditions. Therefore, if these conditions persist, the population will continue to be negatively impacted. However, the simulations presented here suggest that, given the frequency of such an event occurring and its predicted effects, the absolute impact of an isolated low-flow event would be minor, and as a result, survival and recovery would not be appreciably reduced.

145.    As with purple bankclimber, FWS finds:

[T]he RIOP would have a measurable, but not appreciable impact on the survival and recovery of the fat threeridge due to take if flows are reduced to 4,500 cfs.  ... While the RIOP may also adversely affect fat threeridge critical habitat primary constituent elements by reducing minimum releases to 4,500 cfs, the circumstances triggering this action would occur infrequently, if ever. We do not anticipate that reducing minimum releases to 4,500 cfs once in the next 5 years would alter or affect the critical habitat in the action area to the extent that it would appreciably diminish the habitat's capability to provide the intended conservation role for fat threeridge in the wild.

146.    According to FWS, "the effect to the critical habitat and listed mussels is unknown, as the relationship of fish host densities to mussel densities are unknown at this time."

147.    FWS ultimately concludes: the RIOP:  a) Will not jeopardize the continued existence of the Gulf sturgeon, fat threeridge, purple bankclimber, or Chipola slabshell; and b) will not destroy or adversely modify designated critical habitat for the Gulf sturgeon, fat threeridge, purple bankclimber, or Chipola slabshell.   FWS does, however, find that Gulf sturgeon, fat threeridge, purple bankclimber, and Chipola slabshell could be taken through June 1, 2013, as the result of the RIOP.

148.    FWS finds take of Gulf sturgeon eggs and larvae may occur due to the RIOP when the Corps allows rapid declining stages, especially during drought plan operations.  The form of this take is mortality of fertilized eggs or larvae that results from habitat modification leading to oxygen stress, temperature stress, and/or increased sedimentation.  FWS explained, however, it was "unable to establish the frequency with which take due to project operations may occur."

149.    FWS finds take of listed mussel species due to the RIOP may occur when conditions are such that the Corps reduces the releases from Woodruff Dam to 4,500 cfs.  The form of this take is mortality that results from habitat modification leading to oxygen stress, temperature stress, and/or increased predation.  The take may occur in moderately depositional

microhabitats that become exposed or isolated from flowing water when releases from Woodruff

Dam are less than 5,000 cfs.

150.    FWS explains:

Although take of listed mussels may also occur when mussels occupy stages
greater than 5,000 cfs and when reservoir operations reduce basin inflow to
expose these mussels, we do not anticipate take of this nature at this time. We
have not yet observed a recolonization of habitats at stages greater than 5,000 cfs.
Further, in the absence of flow augmentation from reservoir storage (i.e., the RoR
flow regime), flows would dip to lower levels than the RIOP simulated flows in
all years except two of the comparison period (1975-2007). In the logic of our
effects analysis, this means that the increased frequency and duration of low flows
under the RIOP are generally attributable to depletions and not operations.
Therefore, we do not attribute mortality to mussels resulting from exposure at
flows greater than 5,000 cfs to the RIOP.

151.    The 2008 BiOp purports to include RPMs, but these provisions are merely efforts

to acquire more information from the Corps concerning its RIOP.  For instance, RPM 2 reads

"Clarify the drought contingency component of the RIOP that provides for reducing the

minimum release to 4,500 cfs so that this option is exercised only when necessary to balance

impacts to other project purposes that are reasonably certain to occur without the reduction."

152.    The T&C implementing this RPM reads:

a) In consultation with the Service, the Corps shall provide to the Service by
August 30, 2008, written clarification of the process and criteria that shall apply
to the decision to reduce minimum releases to levels less than 5,000 cfs. b) The
clarification of the RIOP shall describe, at minimum, the methods by which the
Corps will estimate the impacts to other project purposes if a minimum release
reduction is not implemented and the expected magnitude and duration of the
reduction. c) The Corps shall establish internal communication procedures to
address unanticipated events that could have adverse effects to listed species.
These procedures should be written and include 1) alerting the Service and
appropriate State agencies, and 2) completing a summary on how the event was
handled and recommendations to further improve procedures that will assist in
minimizing harm to listed species.

153.    RMP 4 reads:   "Evaluate alternative strategies for avoiding stranding Gulf

sturgeon eggs and larvae when flows are declining from 40,000 cfs during the months of March,

April, and May."  The T&C implementing it reads:  "The Corps shall provide to the Service by January 31, 2009, an updated assessment of the effect of fall rates on sturgeon spawning based on the past operating procedures and results of a model that accurately represents the operational rules of the RIOP, including it's fall rate provisions.  The Corps shall propose appropriate means to avoid and minimize any impacts identified in this analysis."

## FIRST CLAIM FOR RELIEF

### *Unlawful Segmentation of Actions Subject to ESA Section 7 Consultation*

154.    Plaintiff incorporates by reference all preceding paragraphs.

155.    The last official Water Control Plan for the Chattahoochee River and its five federal dams was adopted almost <u>50 years ago</u>.  The Corps elected to modify that formally approved Water Control Plan by informal action some 20 years ago.  As the Corps has explained:  "The most recent approved Water Control Plan for the ACF system is dated 1959.  The Corps' draft Water Control Plan for the ACF Basin was completed in 1989.  Since that time, operations have been conducted in accordance with the draft Water Control Plan [i.e., the De Facto Plan]."

156.    The ESA requires the Corps to consult on <u>all</u> its proposed discretionary reservoir operations in the ACF Basin.  Those operations are generally articulated in the De Facto Plan.  The impact of fundamental choices detailed in the De Facto Plan, including the action zones and the minimum flows, continue even under RIOP.  The RIOP incorporates those concepts and, according to the Corps, those concepts even limit the Corps' discretion to implement alternative flow regimes that would meet the Apalachicola Species' needs better than the RIOP.

157.    The Corps never has consulted on the De Facto Plan or its implementation of that plan.  The RIOP articulates just a part of the Corps' operation of the ACF Basin reservoirs as

more generally set forth and dictated by the De Facto Plan. The Corps, simply put, has not consulted on its operations as required by ESA Section 7.

158.   The Corps may not "engage in a series of limited consultations without ever taking a comprehensive assessment of the impacts of their overall activity on protected species." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003); *see also Nat'l Wildlife Fed'n v. N.M.F.S.*, 481 F.3d 1224 (9th Cir. 2007). By limiting its consultation to the RIOP, the Corps has unlawfully segmented its dam and reservoir operations, isolating from ESA review the fundamental discretionary decisions that ultimately result in the flows reflected in the RIOP. By failing to object to this approach when consultation initiated, the Service facilitated the Corps' unlawful approach.

159.   The Corps has violated its procedural obligation arising under ESA Section 7(a)(2) to consult with the FWS on the totality of its reservoir operations in the ACF Basin. The Service has violated its obligation under ESA Section 7 to analyze the effects of the entire action.

160.   The agencies' actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## SECOND CLAIM FOR RELIEF

### *The Service's Unreasonable Findings in the BiOp*

161.   Plaintiff incorporates by reference all preceding paragraphs.

162.   The ESA requires the FWS to determine if the RIOP is likely to jeopardize the continued existence of any endangered or threatened species using the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2).

163.    The ESA requires the FWS to determine if the RIOP will "result in the destruction or adverse modification of [the designated critical] habitat" of a listed species, using the best scientific and commercial data available.  16 U.S.C. § 1536(a)(2).

164.    These assessments must take into account, among other factors, how the RIOP impacts the conservation (*i.e.*, recovery) goal of the ESA.  The Service's analyses of "jeopardy" and "adverse modification" fail to account for the potential impact of the RIOP on recovery of the Apalachicola species.

165.    The Service failed entirely to analyze the impact of moving the point of measurement for minimum flow requirements in the Apalachicola River from Woodruff Dam to the Chattahoochee gage, a change that resulted in a reduction in flow of between 400-600 cfs (or roughly 10% of the total River flow during low flow periods).

166.    The conclusion of the FWS that the RIOP is not likely to result in jeopardy or the destruction or adverse modification of critical habitat is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and ESA consultation regulations and has no basis in the BiOp or anywhere else in the administrative record.

167.    The Service's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

### THIRD CLAIM FOR RELIEF

*The Service's Failure to Develop Reasonable and Prudent Alternatives that Will Avoid Jeopardy and Adverse Modification*

168.    Plaintiff incorporates by reference all preceding paragraphs.

169.    The Service is obligated under ESA Section 7(a)(2) to assist federal agencies in insuring that their actions do not jeopardize listed species or adversely modify their critical habitat by including RPAs when necessary to avoid such a result.

170.    By virtue of the actions giving rise to Florida's Second Claim for Relief, the FWS concluded that it need not provide RPAs to the Corps that would avoid jeopardy and adverse modification.  These determinations were unlawful.  The Service's consequent failure to include RPAs in the BiOp is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

171.    These actions and omissions of the FWS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## FOURTH CLAIM FOR RELIEF

### *The Service's Unlawful ITS*

172.    Plaintiff incorporates by reference all preceding paragraphs.

173.    When it issues an ITS, the Service is required to include RPMs and T&Cs that minimize take.  In addition, the ITS, itself, must not have the effect of jeopardizing listed species that are the subject of the ITS.

174.    As a practical matter, the ITS does not contain any RPMs or T&Cs.  The so-called RPMs are nothing more than requests for better definitions of the Corps' proposed actions.  The RPMs do nothing to actually minimize the impact of take on the ACF Species.

175.    In the alternative, the ITS unreasonably discounts the effect of authorized takings under the RIOP on the mussel species as a whole.  The ITS authorizes the death of all known individual purple bankclimber in the Apalachicola River.  The ITS authorizes the death of at least 9% of the remaining fat threeridge population, or a cumulative reduction in population of

27% in three years.  The FWS has failed to articulate any rational basis on which one can conclude that the ITS will not result in jeopardy to the mussels in the Apalachicola River.

176.    The Service's RPMs are based, in part, on an unsupportable interpretation of the scope of the Corps' discretion under the De Facto Plan – a document that never has been formally adopted in conformance with the Flood Control Act or the Corps' regulations and which never has been subjected to scrutiny under the ESA or any other federal environmental law.  The Service's consequent failure to require a higher base flow than 5,000 cfs, despite clear evidence that such a flow was supportable from a hydrologic standpoint, and that a flow of at least 6,000 cfs was appropriate from a biological standpoint, fails to minimize the impact of take on the mussel species.

177.    In formulating its ITS, therefore, the Service acted in a manner that is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and ESA consultation regulations.

178.    These actions and omissions of the FWS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

**FIFTH CLAIM FOR RELIEF**

*The FWS' Failure to Employ the Best Scientific and Commercial Data Available*

179.    Plaintiff incorporates by reference all preceding paragraphs.

180.    In rendering a biological opinion, the FWS must rely solely on the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  In the BiOp, the Service ignored entirely or discounted much of the best scientific and commercial data available concerning the needs of Apalachicola Species and their habitats, including materials provided by Florida.

181.    In the BiOp, the Service ignored or did not properly account for, *inter alia*: (a) the dramatic changes in geomorphology experienced by the Apalachicola River since the Corps dams were constructed, (b) the impact of upstream depletions on Basin Inflow to the ACF reservoir system and, thus, the amount of water that could be provided under the RIOP absent those depletions, (c) data provided by Florida bearing on the needs of the Apalachicola Species, and (d) the actual observed impacts of operations under the IOP in 2006, the modified IOP and the EDO in 2007.

182.    Rather than relying on the best scientific and commercial data available, the Service reached for novel conclusions to justify the presence of substantial mussel populations in areas like Swift Slough, and then discount the impact of the IOP, the modified IOP, the EDO and the RIOP on those populations.  The Service, therefore, failed to "develop the biological opinion with the available information giving the benefit of the doubt to the species."

183.    In formulating its BiOp, therefore, the Service acted in a manner that is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

184.    These actions and omissions of the FWS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## SIXTH CLAIM FOR RELIEF

### *The Service's Unlawful "Comparative" Analysis*

185.    Plaintiff incorporates by reference all preceding paragraphs.

186.    ESA Section 7 requires the Service to employ an "aggregative" approach to analyzing the impacts of the RIOP (and its predecessors).  The Service's erroneous findings giving rise to Florida's Third and Fourth Claims for Relief are the direct result of the Service's

"comparative" analytical approach to the ESA Section 7 consultations in the ACF Basin. Under a "comparative" approach to the jeopardy analysis, "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." *NWF v. State of Idaho*, 481 F.3d 1224, 1235 (9th Cir. 2007).

187.    In formulating its BiOp, therefore, the Service acted in a manner that is arbitrary, capricious and not in accordance with Section 7(a)(2) of the ESA and the consultation regulations.

188.    These actions and omissions of the FWS are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the ESA and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

## SEVENTH CLAIM FOR RELIEF

### *The Corps' Ongoing Substantive Violation of Section 7*

189.    Plaintiff incorporates by reference all preceding paragraphs.

190.    The totality of the Corps' operations, including that subset thereof identified by the Corps as the RIOP, continue to jeopardize the continued existence of the Apalachicola Species and adversely modify habitat designated as critical for the Gulf sturgeon and proposed as critical for the mussels in violation of ESA Section 7's obligation to avoid jeopardy and adverse modification of critical habitat.

191.    The BiOp is patently arbitrary and capricious. Accordingly, the BiOp does not excuse the Corps' substantive violations of ESA Section 7, which are ongoing at this time.

## EIGHTH CLAIM FOR RELIEF

### *The Corps' Ongoing Violation of Section 9*

192.    Plaintiff incorporates by reference all preceding paragraphs.

193.    The totality of the Corps' operations, including that subset thereof identified by the Corps as the RIOP, continue to take members of the Apalachicola Species in violation of ESA Section 9's prohibition on take.

194.    The ITS is patently arbitrary and capricious and does not excuse the Corps' substantive violation of ESA Section 9, which is ongoing at this time.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

1.    Adjudge and declare that the Corps violated its obligation to consult on all discretionary dam and reservoir operations in the ACF Basin by limiting consultations to the original IOP, the modified IOP, the EDO and, ultimately, the RIOP without ever consulting on the Corps' broader reservoir operations as more particularly set forth in the De Facto Plan;

2.    Affirmatively enjoin the Corps to consult fully under ESA Section 7(a)(2) on its full suite of ACF Basin reservoir operations, including those established in the De Facto Plan and carried forward in the RIOP;

3.    Adjudge and declare that the Service has violated ESA Section 7 and its implementing regulations by:  a) employing a comparative analytical approach to its "jeopardy" and "adverse modification" determinations and to its "take" determinations; b) failing to rely exclusively on the best available scientific and commercial data; c) making no-jeopardy/no-adverse modification findings for the Apalachicola River Species in the BiOp that are arbitrary, capricious, an abuse of discretion and contrary to law; and d) failing to include in the ITS RPMs and T&Cs that minimize the impact of take on the species.

4.    Enjoin the FWS to withdraw the BiOp and prepare a biological opinion that complies with the requirements of the ESA;

5.      Adjudge and declare that the Corps currently is in violation of both ESA Sections 7 and 9 by implementing the RIOP;

6.      Enjoin the Corps to provide flow support (including releases from reservoir storage when necessary) to ensure that the Apalachicola River Species are not harmed until consultation has been properly completed on all of the Corps' ongoing, discretionary dam and reservoir operations in the ACF Basin;

7.      Retain jurisdiction over this matter until Defendants have fully complied with the Court's order;

8.      Award plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys fees, associated with this litigation; and,

9.      Grant plaintiff such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 15th day of October, 2008.

BILL McCOLLUM
ATTORNEY GENERAL

Jonathan A. Glogau
Chief, Complex Litigation
Florida Bar No. 371823
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300, ext. 4817

HOGAN & HARTSON LLP
James T. Banks
Parker Thomson
1111 Brickell Ave., Suite 1900
Miami, FL  33131
Tel.  (305) 459-6613
Fax  (305) 459-6550

HUSCH BLACKWELL SANDERS LLP

**s/ Thomas R. Wilmoth**
Thomas R. Wilmoth
Nebraska Bar No. 22518
Donald G. Blankenau
Nebraska Bar No. 18528
206 S. 13th Street, Suite 1400
Lincoln, NE 68508-2019
Tel. (402) 458-1500
Fax (402) 458-1510
tom.wilmoth@huschblackwell.com
don.blankenau@huschblackwell.com

*Attorneys for Plaintiff State of Florida*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and that ECF will send an e-notice of the electronic filing to the following:

**Edward S. Allen**
eallen@balch.com

**John C. Allen**
jallen@mckennalong.com

**Haley A. Andrews**
handrews@lightfootlaw.com

**James T. Banks**
jtbanks@hhlaw.com,nnbarefoot@hhlaw.com,gecata@hhlaw.com

**Natalie Barefoot**
nnbarefoot@hhlaw.com

**Donald G. Blankenau**
don.blankenau@huschblackwell.com

**Robert S. Bomar**
bbomar@law.ga.gov,bbrbomar@comcast.net

**Luca R Bronzi**
LRBronzi@hhlaw.com,mmorales@hhlaw.com

**Bruce P. Brown**
bbrown@mckennalong.com

**James A. Byram , Jr**
jbyram@balch.com

**Thomas L. Casey , III**
tcasey@balch.com,jschober@balch.com

**William S. Cox , III**
wcox@lfwlaw.com,tammyw@lfwlaw.com

**Lee A. DeHihns , III**
lee.dehihns@alston.com

**Teri L. Donaldson**
tdonaldson@ssd.com

**William M. Droze**
william.droze@troutmansanders.com,terri.griffin@troutmansanders.com

**J. Patrick Floyd**
j.patrickfloyd@jpatrickfloyd.com

**Lewis B. Jones**
lbjones@kslaw.com,jfortuna@kslaw.com,abalderamos@kslaw.com,pbarmeyer@kslaw.com

**Nikaa Baugh Jordan**
njordan@lfwlaw.com

**Joel M. Kuehnert**
jkuehnert@bradleyarant.com

**Lake Lanier Association**
clydemorris@charter.net

**Matthew H. Lembke**
mlembke@bradleyarant.com

**James A. Maysonett**
james.a.maysonett@usdoj.gov,EFILE_WMRS.ENRD@usdoj.gov

**C. Grady Moore , III**
gmoore@balch.com

**David Montgomery Moore**
david.moore@troutmansanders.com

**Clyde Y. Morris , Jr**
clydemorris@charter.net

**W. Larkin Radney , IV**
lradney@lfwlaw.com

**Natalie D. Sacha**
natalie.sacha@troutmansanders.com

**Robert E. Sasser**
rsasser@sasserlawfirm.com,kwilson@sasserlawfirm.com,frank.taylor@atchisonlaw.com,
tvickers@sasserlawfirm.com

**Sean W. Shirley**
sshirley@balch.com,kepowell@balch.com

**R. Todd Silliman**
tsilliman@mckennalong.com

**Benjamin Lee Snowden**
ben.snowden@alston.com

**Ruth Ann Storey**
ruth.ann.storey@usdoj.gov

**Spencer M. Taylor**
staylor@balch.com

**Andrew McFee Thompson**
athompson@sgrlaw.com,jreece@sgrlaw.com,jkrause@sgrlaw.com,tdennington@sgrlaw.com

**Parker D. Thomson**
pdthomson@hhlaw.com,gecata@hhlaw.com

**Orlando E. Vidal**
ovidal@sonnenschein.com,ksealy@sonnenschein.com,jaquilina@sonnenschein.com,
nreeber@sonnenschein.com

**Clinton A. Vince**
cvince@sonnenschein.com,jgratch@sonnenschein.com

**Thomas R. Wilmoth**
tom.wilmoth@huschblackwell.com,sharon.marburger@huschblackwell.com

**Charles A. Zdebski**
charles.zdebski@troutmansanders.com,laura.kalanevich@troutmansanders.com


HUSCH BLACKWELL SANDERS LLP

**<u>s/ Thomas R. Wilmoth</u>**
Thomas R. Wilmoth
Nebraska Bar No. 22518
206 S. 13th Street, Suite 1400
Lincoln, NE  68508-2019
Tel.  (402) 458-1500
Fax  (402) 458-1510
twilmoth@blackwellsanders.com

*Attorney for Plaintiff State of Florida*